2024 IL App (1st) 221915-U

No. 1-22-1915

Order filed December 10, 2024

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 11 CR 12175 |
| | ) | |
| LESTER GREEN, | ) | Honorable |
| | ) | Erica L. Reddick, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE McBRIDE delivered the judgment of the court.
Presiding Justice Van Tine and Justice Howse concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court did not err in denying defendant relief following an evidentiary hearing on his allegations of ineffective assistance of trial counsel and in denying defendant's motions for forensic testing in support of his allegations.

¶ 2    Following a jury trial, defendant Lester Green was convicted of aggravated battery with a firearm and sentenced to 30 years' imprisonment. On direct appeal, we remanded for a proper inquiry into his *pro se* posttrial motion alleging ineffective assistance of counsel pursuant to *People*

*v. Krankel*, 102 Ill. 2d 181 (1984).[1] See *People v. Green*, 2016 IL App (1st) 134011. Following a preliminary inquiry and evidentiary hearing, the court denied relief.

¶ 3 On appeal, defendant contends that the trial court erred by not allowing his motions for forensic testing (725 ILCS 5/116-3 (West 2012)) in support of his claims of ineffective assistance and by limiting the evidentiary hearing to the ineffectiveness claims in his *pro se* posttrial motion rather than also considering the ineffectiveness claims subsequently filed by counsel. We affirm.

¶ 4                                    I. BACKGROUND

¶ 5 Defendant was charged with attempted first degree murder, aggravated battery with a firearm, and unlawful use of a weapon by a felon (UUWF). Two attorneys from the office of the Public Defender of Cook County (PD's office) represented defendant before and during trial.

¶ 6 Shortly before trial in October 2012, the court asked defendant if he agreed with the statement in his answer to discovery that he would rely on the State's inability to prove him guilty beyond a reasonable doubt and "also may assert the defense of self-defense." Defendant agreed. When the court asked if defendant had discussed with trial counsel any possible witness other than a person named Gregory Moore, defendant said no.

¶ 7                                    A. Trial

¶ 8 At trial, Corey Brown testified that, on the evening of July 18, 2011, he went to the Brown Sugar Lounge (Lounge) in Chicago, where he met Diana Stewart. He had never seen Stewart before then. As Brown and Stewart talked outside the Lounge, an "SUV-type vehicle" passed by twice and stopped near them. Brown saw three people inside the vehicle including defendant, the

---

[1] The Honorable Rosemary Grant Higgins presided at trial, and the Honorable Erica L. Reddick presided following remand.

driver. Defendant exited the vehicle and spoke with Stewart. Defendant tried to greet Brown by extending his hand, but Brown did not return the gesture because he felt defendant interrupted the conversation. Brown thought that defendant "seemed irritated" or "offended" that Brown did not take his hand. Defendant returned to the vehicle and drove away.

¶ 9     After some time, Brown and Stewart "ended up *** at the door" of the Lounge. Brown saw defendant, with his hands in his pockets, walking towards him. Defendant stopped near Brown and asked to speak, but Brown declined. Defendant's "hand pointed in his pocket and he shot through his pants pocket," as Brown heard a loud gunshot. Brown pushed two women into the doorway of the Lounge, then "tried to get inside, too." Defendant followed Brown inside, drawing a "dark blue steel" firearm and firing it again as Brown tried to close the door. Brown and defendant struggled over the door, then "tussled for the gun." Defendant shot Brown in the thigh and bit his arm before Brown put "a finger in the trigger so [defendant] could not pull the trigger again."

¶ 10     Eventually, police and an ambulance arrived. Brown was taken to a hospital, where his shorts were removed. At trial, Brown opened a sealed bag, removed a pair of shorts, and identified them as the shorts he wore on the night of the shooting. According to Brown, the shorts had holes and blood stains that were not present before he went to the Lounge.[2] Brown also did not have his leg wound or bite mark to his arm before defendant inflicted them.

¶ 11     Brown denied having a firearm or knife that evening, discharging the firearm, or seeing anyone else in possession of the firearm. He acknowledged his 2003 felony conviction for aggravated unlawful use of a weapon.

---

[2] The record does not indicate whether Brown wore gloves at trial.

¶ 12    On cross-examination, Brown denied that he followed defendant out of the Lounge or grabbed him from behind. While Brown had a finger between the trigger and trigger guard of the firearm at some point, his finger was not on the trigger when it fired. Brown admitted striking defendant so many times that defendant fell unconscious 5 to 10 feet from the Lounge's door and was still unconscious when police arrived. Brown's hands were scraped and bruised.

¶ 13    Stewart testified that she and Brown were talking outside the Lounge when a small SUV stopped nearby and defendant exited. Defendant was a former neighbor she had not seen for years and was not expecting that night. He addressed Stewart as his "little sister" and tried to shake Brown's hand. Brown declined, and defendant looked "uneasy." Defendant walked away and the SUV left. Stewart pulled Brown towards the door of the Lounge to get "out of harm's way."

¶ 14    They were still in the doorway when defendant approached and asked to speak with Brown. Brown refused, and Stewart heard a gunshot. Then, someone pushed her inside the Lounge and the door closed. She then heard two more gunshots. When she came outside after a few minutes, Brown was sitting on someone. Stewart never saw Brown with a firearm that evening.

¶ 15    On cross-examination, Stewart acknowledged she did not see the shooting occur or defendant holding a firearm. She never saw defendant inside the Lounge.

¶ 16    The parties stipulated that Dr. Thom Widell would testify that Brown had a gunshot wound to his left thigh, a human bite to his right forearm, and abrasions to his right leg.

¶ 17    Chicago police officer Laurie Riles testified that she and Officer Michael Gramarosso arrived at the Lounge shortly before midnight on July 18, 2011. Riles found a spent shell casing and a firearm magazine on the sidewalk by the Lounge. At trial, she opened sealed evidence envelopes and identified a shell casing and a firearm magazine as the ones she saw that night,

handling them as she testified.[3] On cross-examination, Riles acknowledged that a shell casing could be moved from where it fell when fired.

¶ 18     Gramarosso testified that he saw the magazine and shell casing on the sidewalk west of the Lounge. He found a black semiautomatic pistol without a magazine, near a white towel, in a vacant lot east of the Lounge. At trial, he identified a firearm, which he removed from a sealed box, as the firearm he saw at the scene.[4]

¶ 19     Chicago police officer Gracie Ramirez testified that she saw defendant being placed in an ambulance at the scene and accompanied him to a hospital. Ramirez was present when defendant's clothing was removed. As the pants were placed into a bag, Ramirez heard something hit the floor and saw a shell casing on the floor. At trial, she opened a sealed evidence envelope and identified a shell casing as the one from the hospital, handling it as she testified. Ramirez saw a hole in defendant's pants by the right front pocket, different from the cuts made by removing his clothes. At trial, she opened a sealed evidence bag and identified a pair of pants as those from the hospital, putting on gloves to handle them as she testified. On cross-examination, Ramirez admitted she did not know if the hole in defendant's pants existed before the incident.

¶ 20     The parties stipulated that evidence technician Cheryl Dust would testify that she processed the scene on July 18, 2011. On the street by the Lounge, in Riles's presence, Dust recovered a .380-caliber shell casing and a magazine containing five .380-caliber live bullets. On an empty lot east of the Lounge, Dust recovered a .380-caliber semiautomatic pistol without a magazine.

---

[3] The record does not indicate whether Riles wore gloves at trial.
[4] The record does not indicate whether Gramarosso wore gloves at trial.

¶ 21 At the hospital with Ramirez, Dust recovered another .380-caliber shell casing and defendant's clothing including his pants. Also at the hospital, Dust recovered Brown's shorts containing "a hole." Dust would testify that she inventoried the recovered items, which "were sent in a properly sealed condition *** to the Illinois State Police Crime Lab for testing and analysis."

¶ 22 The parties also stipulated that forensic scientist Kellen Hunter would testify that the two recovered shell casings had been fired from the recovered pistol.

¶ 23 Forensic scientist Scott Rochowicz testified that he swabbed the inside of the front pockets of defendant's pants and found gunshot residue in both pockets, with significantly more in the right pocket. Rochowicz opined that "the right pocket and the left pocket *** either contacted a [gunshot residue] related item or was in close proximity to a firearm when it was discharged." On cross-examination, Rochowicz acknowledged that testing for the presence of gunshot residue does not reveal how or when it was deposited.

¶ 24 After the State rested, trial counsel informed the court that defendant would not testify. The court then queried defendant and determined that he was choosing not to testify, he had discussed that decision with trial counsel, he understood that it was solely his decision, and he made that decision freely and voluntarily. The court asked defendant if he was "happy with your attorneys' representation," and defendant said he was.

¶ 25 The defense called Chicago police detective Ed Heerdt, who testified that the shell casing was near the door of the Lounge and the magazine was nearby while the firearm and towel were about 20 feet from the Lounge and 60 feet from the sidewalk. The towel had a red fluid on it. Heerdt did not order gunshot residue testing of Brown's hands or clothing, and he did not recall ordering DNA or fingerprint testing.

¶ 26 Heerdt interviewed Brown about the incident. Brown said that, when he saw defendant approaching, he pushed Stewart and another woman back into the Lounge and closed the door behind him. Defendant then walked away from the Lounge. Brown opened the door, went outside, grabbed defendant from behind, and struggled with him to control and disarm him.

¶ 27 Trial counsel sought jury instructions on the lesser offense of reckless conduct, arguing there was evidence defendant acted recklessly during the struggle for the firearm. Noting the evidence of the first shot from defendant's pocket, before the struggle, the court denied reckless conduct instructions. Trial counsel sought instructions on self-defense, which the court delivered.

¶ 28 The trial exhibits were placed in one box and made available to the jury for its deliberations, with the proviso that the jury could not have the firearm and magazine at the same time. The record does not expressly state whether the box went into the jury room.

¶ 29 The jury found defendant guilty of aggravated battery with a firearm and UUWF, finding him not guilty of attempted first degree murder.

¶ 30                                    B. Posttrial

¶ 31 Defendant filed a *pro se* posttrial motion raising various claims of ineffective assistance by his trial attorneys. According to the motion, his trial attorneys failed to investigate the crime scene or to use evidence from discovery to support the defense that Brown had the firearm. The trial attorneys representing defendant did not seek testing of the firearm for fingerprints, or testing to determine whether the hole in defendant's pants was from a bullet. Defendant's trial attorneys advised defendant to agree to stipulations, rather than trying to prove that defendant did not discharge the firearm. The trial attorneys did not call a witness who could prove that the firearm

was moved, and did not impeach Brown's trial testimony with his earlier accounts or with discrepancies from Stewart's accounts.

¶ 32    Defendant also filed *pro se* motions for fingerprint analysis of the firearm and forensic testing of the hole in his pants. The court denied the forensic testing motions.

¶ 33    In April 2013, the court held a hearing where lead trial counsel Eleanor Roos was sworn as a witness but defendant, who also testified, was not. The State examined defendant and Roos about defendant's claims, and argued against the claims. The court denied the *pro se* posttrial motion, addressing each claim and finding no further investigation was needed.

¶ 34    Over defendant's objections, trial counsel filed a posttrial motion raising no ineffectiveness claims. The court denied the motion and sentenced defendant to 30 years' imprisonment for aggravated battery with a firearm. While the court merged the count of UUWF into aggravated battery, the mittimus reflected a seven-year sentence on the UUWF count.

¶ 35    On appeal, defendant contended, relevant here, that the preliminary *Krankel* inquiry was unduly adversarial. *Green*, 2016 IL App (1st) 134011, ¶¶ 3, 22-24, 28. We agreed with the State's concession of error on this issue and remanded for a new *Krankel* hearing. *Id.* ¶¶ 3, 29, 39, 53. We also ordered the fines, fees and costs order and the mittimus be corrected, and affirmed in all other respects. *Id.* ¶¶ 3, 40, 50-52.

¶ 36                                    C. Remand

¶ 37                          1. Motions for Forensic Testing

¶ 38    Following remand, defendant filed a *pro se* motion for forensic testing of (1) the firearm, magazine, and bullets for fingerprints; (2) the hole in his pants to determine if it was caused by a bullet; and (3) the red fluid on the towel for DNA. He alleged that this testing was not done before

trial, identity was at issue at trial, and the requested testing could produce new, noncumulative, and material evidence of his actual innocence.

¶ 39   The court denied the forensic testing motion in July 2017, finding identity was not at issue because defendant was found unconscious at the scene and argued self-defense at trial. Defendant filed an untimely motion for leave to file a late notice of appeal from the July 2017 order, which this court denied. *People v. Green*, No. 1-17-2586 (Nov. 1, 2017) (dispositional order).

¶ 40   In January 2018, the court appointed new counsel for defendant from the PD's office. In August 2019, new counsel filed a motion for forensic testing, seeking (1) testing of defendant's pants to determine if the hole was from a gunshot; (2) fingerprint testing of the firearm, magazine, shell casings, and bullets in the magazine; (3) testing of the same items for trace fibers to determine if they were wiped with a towel; and (4) DNA testing of the towel. New counsel argued that the test results could support the theory that Brown and not defendant possessed the firearm, so defendant "did not get a fair trial" because "[r]easonable resources were not used to aid in his defense."

¶ 41   In January 2020, the court continued the forensic testing motion for new counsel to determine if a chain of custody was maintained for the evidence and whether identity was at issue.

¶ 42   New counsel filed another forensic testing motion in February 2021, supplementing the August 2019 motion with arguments that identity was at issue because only Brown testified that defendant had a firearm while defendant "has always maintained that he did not have a gun." The new motion also alleged that the exhibits were impounded by the court and the record did not show that the evidence would have been tainted during trial.

¶ 43 In April 2021, the State filed a motion to dismiss the forensic testing motion arguing that identity was not at issue at trial, that defendant could not show that the desired testing would have material results, and that the motion was barred by *res judicata* based on the trial court's prior denial of the same motion in 2017. The State also argued that section 116-3 of the Code of Criminal Procedure (725 ILCS 5/116-3 (West 2012)) does not authorize fiber testing, the gunpowder trace evidence showed a firearm was fired in defendant's pocket, the firearm was handled at trial, and the trial evidence showed that Brown and defendant struggled over the firearm so Brown's fingerprints on it would not be material.

¶ 44 New counsel responded to the State's dismissal motion, arguing that testing could result in new evidence supporting defendant's position that Brown had the firearm. If the items were handled during trial, defendant could show prejudice because if a testing request "had been made in a timely manner and a defense other than self defense had been used," defendant may have had more evidence to support reasonable doubt.

¶ 45 In June 2021, following arguments, the court denied the forensic testing motion, noting that defendant could revisit the issue if he could establish that the items "have not been subject to any contamination or taint" and would support his claims.

¶ 46 2. *Krankel* Proceedings

¶ 47 (a) Motions and Preliminary Proceeding

¶ 48 In October 2021, new counsel filed a "motion for ineffective assistance of counsel (Krankel)," alleging that defendant's trial attorneys failed to investigate defendant's claim that he did not possess a firearm on the day of the shooting, including failing to have the evidence from the crime scene tested for DNA, fingerprints, and other trace evidence. According to the motion,

defendant requested that his attorney have the towel, firearm, magazine, and shell casings tested pretrial because, "while he had limited recollection of the events of that evening, he knew he did not have a gun that day." Therefore, counsel argued that fingerprint testing could show Brown handled the firearm rather than defendant. Counsel also claimed that defendant's trial attorneys should have had defendant's pants tested to determine whether he discharged a firearm in his pocket, and the towel tested to determine if someone used it to wipe the firearm evidence.

¶ 49    Counsel acknowledged in the motion that the results of testing were "uncertain," but "it is certain that these tests were not performed." As the results could support the theory that Brown, and not defendant, possessed the firearm, the testing could "strengthen the second prong required to argue prejudice for a claim of ineffective assistance." Conversely, if the evidence "was determined to be tainted during and after the trial, [that] is demonstrated prejudice" because "[i]f trial counsel made a timely request for testing, established all the elements of self defense, [and] planted more reasonable doubt in the minds of the jury," the results of the trial could have been different.

¶ 50    Newly appointed counsel also claimed that defendant's trial attorneys were ineffective for stipulating to the testimony of Dr. Widell and Hunter, and for not cross-examining Ramirez, Gramarosso, or Riles "regarding the handling of the evidence and any resulting statements of how the evidence was located or found." Also, the trial attorneys were allegedly ineffective for seeking jury instructions on self-defense without introducing evidence that defendant "was not the aggressor," and defendant "should have been advised of this issue as it relates to his decision to not testify." Counsel asked the court to find defendant's trial attorneys ineffective and vacate defendant's conviction.

¶ 51    In November 2021, private counsel appeared for defendant and new counsel from the PD's office was granted leave to withdraw. The court ordered the PD's office to produce its original trial file.

¶ 52    In December 2021, an attorney from the PD's office informed the court that the PD's office could not find the original trial file.

¶ 53    In January 2022, private counsel filed a motion arguing that the PD's office did not support its claim that its original file was lost. The motion sought a new trial or, alternatively, that the court (1) bar trial counsel from testifying about anything that may have been in the file, and (2) infer defendant's trial attorneys were ineffective. In February 2022, the court continued the motion, finding that it was premature until counsel raised all of defendant's claims.

¶ 54    In April 2022, private counsel filed a "supplement/amendment" (supplement) to the October 2021 motion for ineffective assistance of counsel, expressly adopting that motion. In the supplement, private counsel argued he could not "fully and meaningfully cross-examine [defendant's] trial attorneys" unless the court granted his earlier motion to bar defendant's trial attorneys from testifying about the contents of the missing case file. Private counsel reiterated that the court should infer that the missing file would support defendant's ineffectiveness claims.

¶ 55    In the supplement, private counsel claimed that defendant's trial attorneys were ineffective for stipulating to Dr. Widell's testimony because cross-examination could have established that defendant's injuries and Brown's injuries were consistent with Brown being the aggressor, and Brown's bite mark could have been inflicted by someone other than defendant. Defendant's trial attorneys were allegedly ineffective for stipulating to Dust's testimony, as cross-examination could have shown that the hole in Brown's shorts was consistent with him being the aggressor. The trial

attorneys were also allegedly ineffective for stipulating to Hunter's testimony as cross-examination could show "that it had not been established" when the firearm was discharged and by whom; that both Brown and defendant could have fired it; Brown could have fired it; or defendant could have fired it in self-defense. Private counsel also argued that defendant's trial attorneys were ineffective for not explaining the stipulations and obtaining defendant's approval.

¶ 56    Additionally, private counsel alleged that defendant's trial attorneys should have retained an expert to perform the forensic tests on the shell casings, magazine, firearm, and towel, which would have established that Brown handled those items or that they were wiped clean so that "Brown, or someone acting on his behalf, engaged in a cover-up following the altercation." Similarly, the supplement claimed that defendant's trial attorneys should have retained an expert to test Brown's clothing for gunshot residue or to establish that Brown fired the firearm from his pocket. Defendant's trial attorneys should have explained to defendant that, without such evidence, he would have to testify to support a self-defense claim. Additionally, defendant's trial attorneys should not have sought jury instructions on self-defense without supporting evidence. The supplement claimed that defendant's trial attorneys failed to investigate the case, including adequately consulting with defendant.

¶ 57    During proceedings in September 2022, the court stated it was conducting a preliminary *Krankel* inquiry and asked private counsel what defendant's ineffective assistance claims were. Private counsel replied that the claims were those addressed in the April 2013 *Krankel* hearing. Counsel listed the "failure of [trial] counsel to appropriately meet with and advise" defendant about self-defense and reckless conduct, including the effect on those theories of defendant not testifying, and failure "to get his consent to the stipulations," which left the source of Brown's injuries and

the circumstances of their occurrence unexplored. Regarding the former claim, private counsel argued that the loss of the case file from the PD's office meant that any testimony that defendant's trial attorneys met with defendant or discussed certain matters with him could not be corroborated. Private counsel also claimed that defendant's trial attorneys admitted to not testing the firearms evidence for fingerprints or DNA despite defendant asserting he did not have a firearm on the night at issue.

¶ 58    Private counsel noted that Brown rendered defendant unconscious before police arrived but the firearm and magazine were separated, with the firearm some 100 yards away from defendant's location. Private counsel argued it was impossible for defendant, who was beaten nearly lifeless, to have taken the magazine out of the firearm and moved the firearm 100 yards. Defendant's trial attorneys should have called Moore to establish the firearm had been in his yard, even farther from the Lounge than the vacant lot. Private counsel argued that Brown's clothing should have been tested for gunshot residue and holes in defendant's pants and Brown's shorts should have been tested to determine whether they were from gunfire. Lastly, private counsel argued that, while Roos said in the 2013 inquiry that she viewed police video, she did not seek or view other security video nor interview any possible eyewitnesses.

¶ 59    The court then examined Roos, who along with Theresa Nelson represented defendant at trial. Roos explained that case files of the PD's office are warehoused when proceedings end so defendant's trial attorneys did not keep or misplace the file. Roos visited defendant in jail "many times" and reviewed discovery with him. Defendant sent Roos "many letters," but did not explain to Roos or Nelson "what actually happened that night."

¶ 60    Roos stated that she would not "obtain forensic evidence if [she was] not sure it is not going to make [her] client's situation worse," especially "where there was no forensic evidence pointing to [defendant] and that was argued *** to the jury in [her] closing arguments." Also, as the firearm was "mishandled" and found near a towel, she did not believe it had useful evidence. Roos had an investigator look for witnesses and security cameras, and Moore's testimony that the firearm was even farther from the Lounge would not have improved the defense case that someone other than defendant moved the firearm while he was unconscious.

¶ 61    Roos discussed the stipulations with defendant and would not have entered into them if he had not approved them. Moreover, Brown gave "compelling firsthand testimony" on cross-examination that he beat defendant into unconsciousness and injured his hands doing so, and "dry medical testimony" would not add to that. Roos did not believe "in [her] experience" with evidence technicians that Dust would be able to testify to anything more than her recovery and inventorying of the evidence. Similarly, Roos did not believe she could have obtained testimony from cross-examining Hunter that would not have been speculative or argumentative. Roos sought reckless conduct instructions only because defendant insisted. As to defendant testifying to support self-defense, Roos said he "did not want to testify because [he] was adamant he had no idea what happened that night."

¶ 62    Regarding testing Brown's shorts for gunshot residue, Roos did not doubt that residue would be found because Brown had been near a discharging firearm. Regarding the hole in defendant's pants, there was testimony a hole existed but no evidence a gunshot caused it, and Roos was concerned that testing could establish that a gunshot caused the hole. Roos acknowledged that the State argued by inference that the hole resulted from a gunshot.

¶ 63    On the court's examination, Nelson explained that Roos as first chair on the case made decisions but consulted with her. Nelson and Roos met defendant before trial and discussed the case, at least once for at least an hour. Nelson investigated the scene without Roos but could not recall if she searched for security cameras. Defendant asked for reckless conduct instructions and Roos "attempted to the best of her ability to get" them. Nelson, Roos, and defendant had "a long discussion" of whether he should testify," and discussed "that he couldn't testify if he didn't remember what happened." Nelson could not recall discussing testing of Brown's clothing. Defendant discussed "independent testing on various things," but Nelson and Roos worried that he "couldn't tell us what happened," so testing could "end up incriminating him potentially rather than exonerating him."

¶ 64    Nelson said that her case file as second chair would have also been warehoused after the trial proceedings. Nelson's file was not lost, as far as she knew, but it would contain only Nelson's investigation, discovery, and notes; that is, it was "different from Miss Roos' first chair file."

¶ 65    After reviewing the transcript of the 2013 preliminary *Krankel* inquiry, the court stated that it was "required to consider the preliminary *Krankel* inquiry based on the defendant's allegations at the time, not the additional" claims in private counsel's supplement. The court would consider the claims raised in 2013, but not the testimony from the first *Krankel* inquiry because the inquiry was unduly adversarial.

¶ 66    The court found no merit in the claim that defendant's trial attorneys should have better impeached Brown with Detective Heerdt's testimony. It stated the disputed claims that would be the subject of the evidentiary hearing were whether defendant's trial attorneys "failed to discuss

with [defendant] the stipulations, failed to visit him, failed to investigate with respect to the crime scene," or failed to properly research reckless conduct.

¶ 67                              (b) Evidentiary Hearing

¶ 68    The case proceeded to an evidentiary hearing held *instanter*.

¶ 69    Roos testified that she could not recall how long after she was assigned defendant's case that she visited him, but it would have been "relatively promptly." She met with defendant more than three times before trial. The last meeting was "like the week of trial," but she could not recall for how long, who else was present, or what was discussed. Defendant sent Roos "a number of letters," which were in the missing file. Roos was aware that defendant raised ineffective assistance claims in 2013, but was unaware that he appealed the disposition of those claims until she learned in 2021 that her testimony would be needed.

¶ 70    Private counsel asked Roos if any of defendant's letters "indicated to you that he was not the possessor of the firearm on the night he allegedly shot" Brown. Roos did not recall him writing to that effect, and "his letters were definitions of zealous defense, pep talks, and other stuff" but "did not contain a lot of information that were factual about the actual case." She did not encourage clients to put facts about their case in letters "because even though it is supposed to be going to counsel, I feel they are sometimes read by the jail."

¶ 71    Private counsel asked Roos if she "never informed [defendant] that if he didn't testify at the trial, there wouldn't be any evidence in the record to support a claim of self-defense." Roos replied that she and defendant "had a conversation about self-defense," and she told him "that if [he] could testify to self-defense, that would be incredibly helpful." Noting that the trial court gave

self-defense jury instructions, Roos opined, "I don't think *** you can take the position that there was absolutely no evidence of self-defense."

¶ 72     Private counsel asked Roos if she told defendant "that if he did not take the stand at trial, there wouldn't be any other evidence in the record to support a claim of self-defense." Roos replied, "Absolutely," as "we went through all of his evidence, we went through what we could possibly put on his trial, and we went through the strength and weaknesses *** and we agreed and went on the self-defense. He understood." Defendant proposed seeking jury instructions on reckless conduct. Roos did not research reckless conduct for defendant's case before he proposed it "because we had no facts to support reckless conduct because he could not tell me what happened."

¶ 73     Roos acknowledged stating in 2013 that she did not go to the crime scene. Roos knew that Nelson went to the scene, and Roos had an investigator photograph the scene and interview any witnesses. Roos did not know if "Nelson created any notes, documents, or records memorializing her visit to the scene," nor if Nelson interviewed any witnesses. She knew the investigator interviewed Moore but could not recall if the investigator interviewed other witnesses. When private counsel asked Roos if she, Nelson, or an investigator interviewed "the 50 or so people that were referenced generally or specifically in the police reports," which Roos read, the court interjected that the question was "outside of the scope of this *Krankel* inquiry."

¶ 74     Roos acknowledged that she did not have the hole in defendant's pants tested or consult an expert witness about the hole. She also did not have Brown's clothing tested for gunshot residue. Roos was aware that the firearm magazine was found near the Lounge but had "no independent knowledge as to where [the firearm] was recovered" because the police reports and Moore's account were contradictory. Roos acknowledged that defendant requested testing of the firearm

for fingerprints and DNA, and she "made a strategic decision" not to order such testing. Roos did not "request any independent testing of any evidence in this case" or "consult any outside experts."

¶ 75    Roos was aware that a police camera "captured events that were after the *** physical altercation," but she could not recall what the events were. As she recalled, there was no other video. She could not remember what steps she or her team took to find other video, except that she would have told the investigator to include, in photographing the scene, any visible cameras for follow up.

¶ 76    Roos recalled that defendant told her that Moore lived on the far side of the vacant lot next to the Lounge and could shed light on where the firearm was found. Moore told the investigator that he found the firearm in his backyard. Roos "made a strategic decision not to call Mr. Moore at trial" as he would merely have contradicted police testimony regarding where the firearm was found, and it was not her defense here to show the police were lying or mistaken.

¶ 77    When private counsel asked Roos to describe the steps her team took to ascertain how the firearm and magazine came to be where they were found, the State objected that the question was outside the scope of the evidentiary hearing. Private counsel argued that the answer was relevant to the *Krankel* claim that the firearm evidence should have been tested to support self-defense. The court stated that it needed to know the nature of defendant's trial attorneys' theory of the case to determine relevancy. Roos testified that the defense theory was self-defense but no defense witnesses were called to support that theory. Instead, the testimony of Brown and Stewart established that Brown had been hostile towards defendant, resisted going inside the Lounge at Stewart's urging, and beat defendant unconscious.

¶ 78    When private counsel asked if Roos had tried to counter on cross-examination Brown's testimony that defendant shot him first, the court interjected that was beyond the scope of the evidentiary hearing. Private counsel moved to strike the previous answer because "either she is not allowed to testify at all in our view or if she does, as she did in this narrative form, we are allowed to attack her credibility." The court denied the motion, finding that a timely objection to Roos's answer had to directly follow her answer. Private counsel argued that Roos's answer was objectionable as false because defendant's trial attorneys "never objected to or attacked the idea that [defendant] wasn't the shooter even though [he] told counsel that he was not the shooter." The court responded that "what was elicited regarding self-defense" was not "raised as part of the *Krankel* pre-inquiry or this hearing."

¶ 79    Private counsel next asked Roos if, having conceded defendant was the shooter, her defense was that he "he did it only because he was attacked in some way by" Brown. The court interjected that the question was "not part of the *Krankel* inquiry. We are not dealing with the self-defense. We were dealing with the ballistics. We were dealing with the number of times of visit, whether he was informed about the stipulations. This is not a license for you to try to retry every aspect of the case that you now disagree with 10 years after the fact."

¶ 80    Neither Roos nor any member of her team interviewed Dust or Hunter about the forensic evidence, and Roos could not recall when she discussed the stipulations regarding Dust or Hunter with defendant. Roos did not interview Dr. Widell about his examination of Brown but read the medical records and concluded that his testimony would be "dry" from the content of the records. Roos discussed the stipulation regarding Dr. Widell with defendant, as she discussed all stipulations with him. She reviewed them with him in person, probably shortly before trial or

during trial when the State tendered draft written stipulations, and he agreed to them. Roos denied that Dr. Widell could have testified that Brown's injuries were consistent with Brown being the aggressor, as Dr. Widell "wouldn't know one way or another who was the aggressor."

¶ 81    When private counsel asked if Dr. Widell could have testified that either defendant or Brown was the aggressor based on Brown's injuries, the court interjected that it was difficult to discern the point of counsel's question and asked counsel what he was trying to ascertain. Private counsel responded that it would develop a point in the supplemental *Krankel* motion, and the court noted that the issues were limited to the *pro se Krankel* motion and it should not have allowed the supplement to be filed. Private counsel replied that the stipulation regarding Dr. Widell was challenged in the *pro se* motion, and the court stated that private counsel should tailor his questions to clearly address issues in the *pro se* motion.

¶ 82    Roos acknowledged that the stipulation regarding Dr. Widell did not state "that Brown's gunshot was consistent with Brown suffering it during the struggle," "the bite mark on Brown could have come from someone other than" defendant, or "the bite mark on Brown was consistent with Brown attacking Green." The State objected to further questions on what the stipulation did not contain. Private counsel argued that he should be able to explore the stipulation's "extraordinarily narrow" nature. The court upheld the objection because the scope of the evidentiary hearing was whether the stipulations were discussed with defendant, not their content.

¶ 83    On cross-examination, Roos testified that she met with defendant "on several occasions," including in lockup after court hearings and scheduled meetings in jail, where they discussed the case and she provided him with discovery. She reviewed a map of the scene, and she reviewed photographs of the scene with defendant.

¶ 84    In preparing for trial, they discussed the two available defense theories, reasonable doubt and self-defense, as "[t]here was no alibi defense provided." Defendant could not provide "any information as to what happened that night" because "[h]e said he did not remember" what happened before, during, or after the shooting. He never told her that he went to the Lounge without a firearm. In discussing self-defense, Roos told defendant it was his choice whether to testify, and "it would have been incredibly useful if [he] could have given us an accounting of the offenses. But since he was unable to, we discussed how we would try to take up the evidence enough to get the instruction and argue to the jury." Even before they decided to argue self-defense, Roos decided not to order additional forensic testing or hire an expert because she did not want to obtain inculpatory evidence, and Roos discussed that decision with defendant.

¶ 85    Roos also discussed with defendant her decision to not call Moore as a witness, as the police evidence already showed the firearm was found far from defendant and Moore would merely complicate the evidence. While Dr. Widell was not examined about Brown's injuries, Roos cross-examined Brown about his own injuries. Had defendant objected to the Dr. Widell stipulation, or any other stipulation Roos discussed with him, Roos would not have stipulated because stipulations involve a defendant's right to cross-examine witnesses. Roos entered into narrow stipulations that did not affect self-defense. The court had granted Roos's requested jury instructions on self-defense.

¶ 86    On redirect examination, Roos was asked if she was testifying that defendant "told [her] that he went to the scene with a gun." Roos replied that defendant "could not account for what happened that night," then clarified that he never told her he went to the Lounge with a firearm.

¶ 87    Nelson testified that she was assigned as second chair on defendant's case about two months before trial. She examined the scene after Roos had an investigator photograph the scene and interview Moore. Nelson did not interview anyone, and she did not recall searching the scene for video cameras. Nelson recalled a jail meeting with defendant, but there may have been more. She met with him in the court lockup on the days of court hearings, and once in the jury room to show him the police video.

¶ 88    On cross-examination, Nelson testified that she may also have discussed with defendant in the jury room meeting stipulations, self-defense, and his inability to recall what happened on the night of the shooting. Nelson could not recall what defendant said he could not remember; that is, whether he could not recall what happened before or after the incident.

¶ 89    On redirect examination, Nelson testified that the jury room meeting was about stipulations in general rather than specific written stipulations, which would have been discussed much closer to trial. As Nelson recalled, defendant never said that he possessed or discharged a firearm on the night of the shooting.

¶ 90    On recross examination, Nelson testified that the defense team presented self-defense by cross-examining Brown and Stewart, establishing that Brown had an aggressive attitude towards defendant, resisted going inside the Lounge as Stewart urged, and beat defendant unconscious. Nelson was unaware of any witnesses the defense could have called to bolster self-defense. As she recalled, defendant never said he did not have a firearm on the night of the shooting, nor did he say he did have a firearm that night. He maintained he could not remember.

¶ 91    Defendant testified that he did not see Roos until five or six months after his arrest, when she met him at the jail, and saw her only once more about two or three weeks before trial. He sent

Roos five or six letters, telling her in the letters and at meetings that he did not have a firearm on the night of the shooting and asking her to have the firearm evidence and the hole in his pants tested. Roos told him that it was her decision, as a matter of trial strategy, to not request such testing. Defendant acknowledged that Roos told him about stipulations, including telling him they would expedite his case. He told her he did not want to stipulate and wanted her to call the witnesses. He could not recall if Roos showed him the written stipulations.

¶ 92 On cross-examination, defendant denied telling his trial attorneys that he did not remember what happened during the incident. When asked what his "specific recollection" of the incident was, he replied, "I just know I didn't commit this crime. I didn't have a firearm. [Brown] had a firearm. He did the shooting. I was unconscious. I got beat." When asked why he chose not to testify if he had a recollection of the incident, defendant answered "I didn't choose not to testify. My attorney told me not to testify." He did not recall the trial court admonishing him that it was his right to decide whether to testify.

¶ 93 On November 10, 2022, following arguments, the court found that defendant made "no showing [that a] new trial should be granted." Notwithstanding the court's earlier statement that it would consider only the *pro se* claims, the court stated that it was now considering the claims in the *pro se* motion, new counsel's October 2021 *Krankel* motion, and private counsel's April 2022 supplement. The court stated that it considered every ineffectiveness claim, "even if I have not enumerated it within the ruling at this point," in concluding "that there was not the ultimate showing" of ineffective assistance.

¶ 94 As to the alleged failure to investigate defendant's claims that he did not have a firearm on the night of the shooting, the court noted that the defense case at trial included that Brown gave a

statement to police admitting that the Lounge door closed and Brown then grabbed defendant as he walked away, and Brown testified to beating defendant into unconsciousness.

¶ 95    Based on testimony by Roos, Nelson, and defendant, the court found the ineffectiveness claim unsupported because defendant "had difficulty providing any information" about the incident and his trial attorneys' decision to not request testing was strategic. Due to defendant's "inability to recall the events," his trial attorneys believed testing could develop evidence against defendant. The court found defendant's trial attorneys were credible "as to what [defendant] communicated to them as they prepared the case" and "forthright about what was done, what was not done."

¶ 96    As to the claim that defendant's trial attorneys should have called witnesses rather than stipulating and should have cross-examined testifying officers about finding and handling evidence, the court found that defendant made no "showing that there was something discoverable or that the evidence would have demonstrated *** prejudice." Regarding the stipulations, the court found that defendant's trial attorneys' testimony rebutted defendant's claims and testimony. Roos described her practice of discussing stipulations twice, once when proposed and again when the stipulation language was finalized, so that the evidence showed defendant's trial attorneys advised defendant regarding the stipulations.

¶ 97    As to self-defense, including the counsel-filed claim that the self-defense instructions were unsupported by evidence, defendant was admonished at trial that it was his choice whether to testify, Roos testified to telling defendant that a self-defense theory would be harmed by him not testifying, and the trial court found enough evidence of self-defense to give the instructions. Conversely, reckless conduct instructions were not given because the trial court did not find

enough evidence to give them, and defendant's trial attorneys "could not proffer an alternate theory as to how it happened *** because of the limitations of [defendant's] memory."

¶ 98 As to defendant's trial attorneys allegedly not impeaching Brown, the court noted that Brown's conviction was elicited at trial. As to the counsel-filed claim of not calling Moore as a witness, defendant's trial attorneys explained that Moore's evidence would not advance the defense case but add the complication of impeaching police testimony that the trial attorneys did not want to impeach. The court found generally that defendant failed to show prejudice from his trial attorneys' decisions.

¶ 99                                    II. ANALYSIS

¶ 100 On appeal, defendant contends that the trial court erred in not allowing his motions for forensic testing in support of his posttrial motion and in limiting the evidentiary hearing to the ineffective assistance claims he raised in his *pro se* posttrial motion.

¶ 101 A defendant shows ineffective assistance of counsel by showing that (1) counsel's performance fell below an objective standard of reasonableness, and (2) there is a reasonable probability that the result of the proceeding would have been different without the deficient performance. *People v. Jackson*, 2020 IL 124112, ¶ 90. Matters of trial strategy, such as whether to call and examine witnesses and present evidence, are generally immune from ineffective assistance claims, and errors in trial strategy do not constitute ineffective assistance unless counsel entirely fails to conduct any meaningful adversarial testing of the State's case. *Id.* ¶ 106; *People v. Custer*, 2019 IL 123339, ¶ 39.

¶ 102 *Krankel* and its progeny created a common law procedure "for defendants to assert posttrial claims that trial counsel provided ineffective assistance." (Emphasis omitted.) *Custer*, 2019 IL

123339, ¶ 25. The *Krankel* procedure is intended to facilitate the trial court's full consideration of a defendant's *pro se* claims that trial counsel was ineffective, create a record, and limit issues on appeal. *Id.* ¶ 26; *In re Johnathan T.*, 2022 IL 127222, ¶ 23.

¶ 103 The *Krankel* procedure begins when a defendant raises a *pro se* posttrial claim of ineffective assistance of trial counsel, whether orally, in a letter or note, or in a written motion. *Johnathan T.*, 2022 IL 127222, ¶ 24. New counsel is not automatically appointed whenever a defendant raises a *pro se* posttrial ineffectiveness claim. *Jackson*, 2020 IL 124112, ¶ 97. Instead, the trial court examines the factual and legal basis for the *pro se* claims of ineffectiveness. *Id.* ¶¶ 97, 105. The court can base its evaluation of the claims on its knowledge of trial counsel's performance and the facial insufficiency of the allegations. *Id.* ¶ 105. It may also inquire of trial counsel and the defendant regarding the facts and circumstances of the allegedly ineffective representation. *Id.* ¶ 110.

¶ 104 If the court determines the *pro se* ineffectiveness claims lack merit or pertain solely to matters of trial strategy, it does not need to appoint new counsel and may deny the *pro se* motion. *Id.* ¶ 97. Conversely, if the allegations show possible neglect by trial counsel, new counsel should be appointed to represent the defendant at the full hearing on the *pro se* claims. *Id.* New counsel can independently evaluate the *pro se* claims and avoid the conflict of interest experienced by trial counsel having to justify his or her actions against the defendant's allegations. *Id.*

¶ 105 Whether the trial court properly conducted a preliminary *Krankel* inquiry is reviewed *de novo*. *Id.* ¶ 98. But if the court conducted an inquiry properly and reached a determination on the merits of the defendant's motion, we reverse only if that decision was manifestly erroneous. *Id.* A manifest error is an error that is clearly evident, plain, and indisputable. *Id.* The failure to conduct

a proper *Krankel* inquiry can be harmless if the State can prove beyond a reasonable doubt that the result of the inquiry would have been the same absent the error, as when claims concern matters of trial strategy. *Id.* ¶¶ 122, 127.

¶ 106   Here, the court's preliminary inquiry showed that there was a factual dispute over the key element of defendant's claims: that defendant had repeatedly told his trial attorneys he did not have a firearm on the day of the shooting. That factual dispute called for an evidentiary hearing.

¶ 107   At the evidentiary hearing, defendant testified consistently with his written allegations that he told his trial attorneys that he did not have a firearm that night. However, Roos and Nelson each testified that defendant never said that he either had, or did not have, a firearm on the night of the shooting but said he had no recollection of that night's events. Given this testimony, it was not manifestly erroneous for the court to conclude that defendant had in fact claimed a lack of memory of the incident and did not tell his trial attorneys that he had no firearm that night. In other words, it is not clearly evident, plain, or indisputable that the court erred in believing Roos and Nelson over defendant when their testimony so directly conflicted. See *Jackson*, 2020 IL 124112, ¶ 98.

¶ 108   The trial court's conclusion that defendant's trial attorneys disputed decisions were matters of trial strategy was not manifestly erroneous.

¶ 109   The only forensic evidence at trial was that the recovered firearm fired the recovered shell casings and gunshot residue was found in defendant's right *and* left pants pockets. Nothing established whether the hole in defendant's right pocket was pre-existing, and nothing but Brown's own testimony established that the hole in his shorts was not pre-existing. Roos explained that, not being able to learn from defendant whether he had a firearm that night, she decided to not request

testing that could add to the sparse forensic evidence against defendant. While Brown struck defendant unconscious, the firearm evidence was found in multiple locations.

¶ 110   Most importantly, Brown gave a statement to Detective Heerdt that was very different from his trial testimony as to what happened. Brown testified that defendant asked if they could talk, and Brown declined. Defendant immediately shot at him, and Brown then pushed Stewart and another woman inside the Lounge. However, Brown told Heerdt that he pushed the women inside the Lounge and closed the door when he saw defendant approaching. Defendant started walking away, Brown then came outside the Lounge and attacked Brown from behind.

¶ 111   Given the aforesaid circumstances, Roos decided to present a self-defense theory with Brown as the aggressor, which was discussed with defendant as Roos and Nelson testified. As Roos explained, proceeding on self-defense, little would be gained by having detailed testimony from police and forensic witnesses or Dr. Widell who treated Brown. Brown himself was cross-examined in detail, which elicited his beating of defendant into unconsciousness. Officer Ramirez was cross-examined to elicit that she did not know if the hole in defendant's pants was there before the incident. Forensic scientist Rochowicz was cross-examined to elicit that gunshot residue testing does not show how or when gunshot residue was deposited. Moreover, the defense called Detective Heerdt to elicit Brown's statement in which he admitted attacking defendant as defendant walked away. Based on the preceding, we find that defendant's trial attorneys conducted meaningful adversarial testing of the State's case, and thus must conclude that any errors in trial strategy could not constitute ineffective assistance. See *Custer*, 2019 IL 123339, ¶ 39.

¶ 112   Other claims of ineffective assistance were addressed directly in the evidentiary hearing. Roos testified to discussing all stipulations with defendant, and testified that she would not have

entered into a stipulation that her client did not approve. The conclusion that defendant approved all stipulations after his trial attorneys discussed them with him is thus not manifestly erroneous. As noted above, Roos did not seek additional forensic testing because, not being able to learn from defendant whether he had a firearm that night, she was concerned that testing could add to the evidence against him rather than refuting the State's case. We find this was reasonable trial strategy under the circumstances.

¶ 113 Defendant contends error from the trial court limiting examination in the evidentiary hearing to his *pro se* claims. After that hearing, however, the court stated that it considered all *pro se* and counsel-filed claims, even those it did not expressly address. Moreover, any error in the trial court's *Krankel* proceedings would be harmless beyond a reasonable doubt given the court's determinations from the evidentiary hearing, including that defendant did not tell his trial attorneys that he did not have a firearm. Defendant's claims about his trial attorneys' performance concern matters of trial strategy that do not constitute ineffective assistance. *Jackson*, 2020 IL 124112, ¶¶ 122, 127.

¶ 114 Defendant also contends that the trial court erred in not allowing the forensic testing he requested *pro se* and through counsel.

¶ 115 The forensic testing statute (725 ILCS 5/116-3(b)(1) (West 2012)) provides in relevant part that a "defendant must present a prima facie case that *** identity was the issue in the trial or guilty plea which resulted in his or her conviction." It is axiomatic that, "[w]here a defendant contests guilt based upon self-defense, compulsion, entrapment, necessity, or a plea of insanity, identity ceases to be the issue" for purposes of section 116-3. *People v. Urioste*, 316 Ill. App. 3d

307, 316 (2000). The trial court therefore properly denied defendant's forensic testing motions on the basis that identity was not at issue because he presented a self-defense theory at trial.

¶ 116   Nothing in the subsequent proceedings calls those rulings into question. Defendant argues "that the very fact that trial counsel brought the self-defense claim at trial was prejudicial to him because he consistently maintained that he did not have the gun on the night of the shooting and counsel failed to produce any evidence to support it." However, it is reasonable to conclude from the evidentiary hearing, as the trial court did, that defendant did *not* tell his trial attorneys that he did not have a firearm on the night of the shooting. Defendant's trial attorneys presented evidence that Brown beat defendant into unconsciousness and admitted to attacking him as he was walking away from the Lounge. Consequently, defendant's trial attorneys' decision to proceed on a self-defense theory is a matter of trial strategy not subject to challenge.

¶ 117                                  III. CONCLUSION

¶ 118   Accordingly, the judgment of the circuit court is affirmed.

¶ 119   Affirmed.